**EVERY NATION CAMPUS MINISTRIES AT SAN DIEGO STATE UNIVERSITY, a student organization at San Diego State University, et al., Plaintiffs,**

v.

**ACHTENBERG, et al., Defendants.**

**Case No. 05CV2186–LAB (AJB).**

United States District Court, S.D. California.

Feb. 6, 2009.

---

Jeremy D. Tedesco, Alliance Defense Fund, Scottsdale, AZ, Timothy D. Chandler, Alliance Defense Fund, Folsom, CA, for Plaintiffs.

Susan Westover–Giali, The California State University Office of General Counsel, Long Beach, CA, John David Blair–Loy, ACLU of San Diego and Imperial Counties, San Diego, CA, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** [Dkt. Nos. 39, 51, 74]

LARRY ALAN BURNS, District Judge.

This case raises a question that is endemic to a free society: who prevails when individual or group liberties run up against community values. Plaintiffs here are four Christian student groups at two California State University ("CSU") campuses [1] who

---

1. San Diego State University ("SDSU") and California State University, Long Beach

do not think they should have to comply with CSU's nondiscrimination policy, a string attached to formal recognition on campus. That recognition is important because it comes with benefits, for example allocated funds and easy, affordable access to meeting rooms. For the Plaintiffs, however, with those blessings would come a curse: they would have to be more inclusive than they want to be—and in a way they believe would compromise what they stand for. Specifically, they would have to open their membership to non-Christians and unapologetic homosexuals. If Plaintiffs must comply with CSU's nondiscrimination policy, they argue, they must also give up their First Amendment rights of free speech, freedom of religion, and freedom of expressive association. They ask the Court to enjoin the CSU campuses and certain affiliated individuals (collectively "Defendants") from denying them formal recognition as a student organization because of their refusal to comply with CSU's nondiscrimination policy. They also want that policy declared unconstitutional.

The matter is before the Court on the parties' cross-motions for summary judgment. The American Civil Liberties Union Foundation filed an *amicus curiae* brief on the First Amendment issues, urging the Court to grant summary judgment for Defendants and to deny summary judgment for Plaintiffs. The Court heard oral argument on the cross-motions on July 25, 2006. Plaintiffs were represented at the hearing by Jeremy D. Tedesco, Esq. and Defendants by Susan Westover, Esq., with David Blair–Loy, Esq. appearing for *amicus curiae*. The cross-motions were taken under submission at the conclusion of that hearing.

As traced below, the resolution of this matter has been complicated and delayed by the Court's hope that certain cases on appeal in the Ninth Circuit during the

pendency of this litigation would shed light on the merits of Plaintiffs' expressive association claim. The Ninth Circuit recently provided the needed beam in the September 9, 2008 concurring opinion amending its April 25, 2008 opinion deciding *Truth v. Kent Sch. Dist.* 542 F.3d 634 (9th Cir.2008) (*"Truth "*). For the reasons discussed below, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiffs' cross-motion.

## I. BACKGROUND

### A. *Procedural History*

#### 1. *Summary*

The procedural history of this case is complicated. The short and simple version of that history is that the Court thought it prudent to await the Ninth Circuit's opinion in *Truth* before ruling on the parties' cross-motions for summary judgment in this case. Although *Truth* was first decided in August 2007, it was not helpful to this Court until September 2008, when it was superseded a second time to incorporate a two-judge concurrence that answered the very question vexing the Court. That concurrence, which the Court considers binding precedent, compels this Order in the Defendants' favor.

#### 2. *Expanded Procedural History*

The Court denied Plaintiffs' Motion for Preliminary Injunction on April 5, 2006, finding they failed to carry their burden to show the requisite degree of harm and need to preserve a status quo. (Dkt. No. 31.) On May 2, 2006, the Court granted Defendants' Motion to Dismiss Count V (Due Process) of the First Amended Verified Complaint ("FAC") for failure to state a claim. (Dkt. No. 37.) That latter ruling left four FAC claims at issue: violation of the First Amendment right to expressive association; violation of the First Amend-

("CSULB").

ment Free Speech Clause; violation of the First Amendment Free Exercise Clause; and violation of equal protection guaranteed by the Fourteenth Amendment.

On January 22, 2007, while the cross-motions for summary judgment were under submission, the Court informed the parties it would postpone filing an order deciding these motions until the Ninth Circuit issued its ruling in *Truth*. The resolution of certain constitutional questions raised in that appeal seemed likely to control the result here. (Dkt. No. 89.) The Ninth Circuit issued its *Truth* ruling, 499 F.3d 999 (9th Cir.2007), on August 24, 2007.[2] The Court then solicited supplemental legal briefing from the parties addressing the effect of that opinion on the issues to be decided in this case. Each side submitted a supplemental brief in September 2007, comparing and contrast-

ing the legal issues and factual circumstances of *Truth* and this case.[3] (Dkt. Nos. 96, 97.)

Defendants contended *Truth* supports their positions, but acknowledged that the decision does not necessarily compel a ruling in their favor. They highlighted "factual differences between how the plaintiffs wanted to include or exclude members" and outlined in a chart some distinguishing facts between the two cases.[4] They went no further than to characterize *Truth* as "an encouraging development, since it certainly tends to favor the University's position on the constitutional claims." (Def.'s Suppl. Brief, 3:16–17). Indeed, Defendants conceded that *Truth* does not necessarily compel a ruling in the University's favor, even if it shows the Ninth Circuit's leanings toward affirming summary judgments that affirm an educational institu-

---

**2.** *Opinion withdrawn and superseded on denial of rehearing by Truth v. Kent Sch. Dist.*, 524 F.3d 957 (9th Cir.2008), *opinion amended and superseded by Truth v. Kent Sch. Dist.*, 542 F.3d 634 (9th Cir.2008).

**3.** The Court had earlier granted Plaintiffs' unopposed Motion for Leave to File Supplemental Authority, a new Seventh Circuit case (*Christian Legal Society v. Walker*, 453 F.3d 853 (7th Cir.2006), reversing denial of a preliminary injunction). (Dkt. No. 74.) The *Truth* court distinguished *Walker* on grounds that the court there stated it could not even determine whether the university had created an open, limited, or non-public forum on the record before it. *Walker* contains a thoughtful dissent, which highlights the differing perspectives on some of the same constitutional issues presented here, albeit in a different procedural posture from this case.

**4.** Defendants' Supplemental Brief 3–4. The Court deems certain of those listed distinctions to be immaterial. In particular, the membership exclusions at issue here encompass not only non-Christians but also certain homosexuals, but that merely adds another category encompassed by the challenged non-discrimination policy, and the exclusion in any event is predicated on religious beliefs. Plaintiffs characterize both the religious com-

mitment and the lifestyle commitment to be part and parcel of the same expressive association right. Another distinction—the policy challenged in *Truth* expressly prohibited unchartered clubs from existing, whereas the CSU policy permits student clubs to exist and have some participation on campus outside the list of officially recognized clubs—ostensibly makes the CSU policy less burdensome. The *Truth* club's "tiered" memberships (*i.e.*, voting members, non-voting members, and attendees) affected that court's analysis because the presence of a "non-voting" category of members, coupled with that club's statement in a brief "that the admission of non-Christians as general members would be unproblematic" (*Truth*, 499 F.3d at 1014) appears at first blush to distinguish the student organizations in this case from the *Truth* club. However, the *Truth* club restricted voting members and officers to persons who signed a statement of faith, professing "the Bible to be the inspired, the only infallible, authoritative word of God." *Truth*, 499 F.3d at 1003. The Plaintiff organizations here also exclude from voting membership and officer positions all non-Christians. To that extent, the distinction with respect to levels of membership appears immaterial.

tion's right to prohibit certain types of discrimination." (Def.'s Suppl. Brief, 5:14–17).

In addition to analyzing the *Truth* ruling, Defendants again urged the Court to await the Ninth Circuit's decision in *Christian Legal Society Chapter of University of California v. Kane*, 2006 WL 997217 (N.D.Cal. Apr. 17, 2006) ("*Kane*") before deciding these cross-motions, as they had in their initial briefing of the cross-motions. They proposed: "If the *Truth* decision does not offer enough help, perhaps the court and parties should await the outcome of the appeal in the *CLS v. Kane* case for further guidance."[5] (Dkt. No. 96, 5:5–6.) The Court chose not to wait for *Kane*. Though dispositive guidance from the Ninth Circuit would have been welcome, there was no telling when it would come. The Court therefore went ahead with these motions without a circuit decision in *Kane*, but informed the parties it would defer ruling until the Ninth Circuit disposed of the then-pending Petition for Rehearing *En Banc* of the *Truth* appeal. (Dkt. No. 98.)

On December 13, 2007, Plaintiffs renewed their request for a ruling on the cross-motions. (Dkt. No. 100.) Defendants opposed the motion, arguing the Ninth Circuit still had not ruled on the *en banc* review request in *Truth*, and the *Kane* appeal was set for oral argument in February 2008. (Dkt. No. 103.) Plaintiffs filed a reply informing the Court, among other things, the Ninth Circuit had taken the *Kane* oral argument off-calendar pending resolution of the *Truth* matter, with instructions that the clerk place *Kane* before the next available panel after *Truth* was decided. The time table for a ruling in both cases and the extent of the additional delay thus became even more uncertain. (Dkt. No. 104.) On February 13, 2008, the Court granted Plaintiffs' motion, conceding that awaiting final decisions from the Ninth Circuit in either *Truth* or *Kane* had "become excessive, with no imminent resolution in sight." (Dkt. No. 106, 2.)

On April 25, 2008, the Ninth Circuit denied rehearing in *Truth* but withdrew its August 24, 2007 opinion and entered a superseding opinion. *Truth*, 524 F.3d 957 (9th Cir.2008). Although that opinion provided some additional insight into that court's likely treatment of certain issues presented in this case, this Court could discern no dispositive guidance on how to resolve Plaintiffs' expressive association claim. Accordingly, on September 4, 2008, the Court *sua sponte* reconsidered its decision to lift the stay of these proceedings

---

**5.** The district court in *Kane* decided cross-motions for summary judgment in a case brought by a Christian student organization to determine "whether a religious student organization may compel a public university law school to fund its activities and to allow the group to use the school's name and facilities even though the organization admittedly discriminates in the selection of its members and officers on the basis of religion and sexual orientation." *Kane*, 2006 WL 997217, at *1. In that case, plaintiff Christian Legal Society ("CLS") contended Hastings' enforcement of its nondiscrimination policy, and its refusal to grant CLS an exception to exclude students on the basis of religion and sexual orientation, infringes its members' rights to free speech, free association, free exercise and equal protection. Virtually every issue before the Court in this case appears also to be raised in *Kane*. Despite Plaintiffs' argument that *Kane* was wrongly decided, the Court believes the *Truth* decision suggests the Ninth Circuit may reach many of the same conclusions as did the district court in *Kane*. In that light, as discussed below, the Court is not persuaded by Plaintiffs' contention the decisions here and in *Kane* should be decided in reliance on the *Dale* line of expressive association cases involving membership restrictions, now that the *Truth* concurrence has clarified the appropriate standards to apply in such circumstances.

and informed the parties it would in fact await the guidance of the Ninth Circuit's *Kane* decision.[6] (Dkt. No. 112.)

■ On September 9, 2008, while *Kane* remained undecided, the *Truth* opinion was again superseded by an amendment, this time to incorporate an analytical concurrence by Judge Fisher, joined by Judge Wardlaw, to augment Judge Wallace's April 25, 2008 analysis. *Truth*, 542 F.3d 634. The concurrence tackled the very issue this Court has found particularly vexing from the start of this case: whether access to the school's recognized student organization forum conditioned on Plaintiffs' elimination of their discriminatory membership policies infringes their right to engage in speech through "expressive association." Not only does the amended and superseding *Truth* decision clarify certain foundational questions for the Court, it is the majority opinion of the Ninth Circuit panel on that issue because two judges signed it.[7] Thus, the Court regards the analytical concurrence by Judge Fisher, joined by Judge Wardlaw, as binding precedent. This order can now be finalized and entered.

### 3. *Truth Case Guidance*

Judge Wallace's main opinion in *Truth* reversed and remanded the district court's grant of summary judgment for the defendant school district ("District"). The opinion first examined whether the District violated the Equal Access Act, 20 U.S.C. § 4071(a) ("Act") by applying its policies prohibiting discrimination on the basis of "creed" (interpreted to include religion) to deny the plaintiff student group recognized status based on the group's Christians-only membership policy. The court found that the District did not violate the Act.

It then addressed the question "whether, and if so how, the First Amendment may apply where a school denies ASB recognition to a student club based on its membership criteria," observing: "it is important to emphasize that the members of Truth are not seeking merely to associate as a group; they are seeking to associate as a *school-sponsored* group." *Truth*, 542 F.3d at 648 (emphasis in original).[8] The *Truth* decision thus aligns with those cases characterizing school-sponsored student organization programs as "limited public forums" for free speech purposes. *Id.* at 648–49 ("Therefore, we must evaluate the District's denial of ASB recognition as a restriction on a 'limited public forum'"), *citing Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (applying limited public forum analysis to a university policy that excluded a group's access to the school's student activities fund, which prevented it from publishing a newspaper, and holding that denial of funding amounted to viewpoint discrimination because viewpoint, not content, was targeted by the exclusion) and *Prince v. Jacoby*, 303 F.3d 1074, 1092 (9th Cir.2002) (holding a school, through its ASB program, "created a limited public forum"). The *Truth* court concluded the District's statements of pur-

6. On September 23, 2008, Plaintiffs filed a Petition for Writ of Mandamus in the Ninth Circuit, USCA Case No. 08–74079, seeking to compel this Court to issue a ruling on their summary judgment motion. The Writ was denied on November 3, 2008. (Dkt. No. 114.)

7. Judge Carlos Bea, dissenting from the Ninth Circuit's denial of rehearing *en banc* in *Truth*, recognized the effect of Judge Fisher's analytical concurrence in which Judge Wardlaw

joined: "This is no standard concurrence, however, because two of the three members of the panel concur in it. Thus, it is the opinion of the panel on this issue and creates binding precedent." *Truth*, 2008 U.S.App. LEXIS 26276, at *6 n. 1 (9th Cir. Nov. 17, 2008).

8. "ASB" here refers to Associated Student Body Council, the entity that reviews proposed charters of student organizations.

pose underlying the nondiscrimination policies advanced the school's basic pedagogical goals, warranting a determination that the school's "decision to restrict access to the ASB program based on a group's willingness to adhere to the school's nondiscrimination policy is reasonable in light of the purposes of the forum." *Truth*, 542 F.3d at 649. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (emphasizing that part of a school's mission is to instill in students the "shared values of a civilized social order," which includes instilling the value of nondiscrimination) (citation omitted). Completing the analysis, the *Truth* court examined the policy for viewpoint-neutrality:

> [T]he school is not denying Truth access based solely on its religious viewpoint, but rather on its refusal to comply with the District's nondiscrimination policy. The District was therefore not engaging in viewpoint discrimination; the "perspective of the speaker" was not the "rationale" for denying Truth access to the limited public forum. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. Applying the nondiscrimination policy to exclude Truth does not show that the school administrators acted "merely because [they] oppose the speaker's view." *Perry [Educ. Ass'n v. Perry Local Educators' Ass'n ]*, 460 U.S. [37] at 46, 103 S.Ct. 948 [74 L.Ed.2d 794 (1983) ].

*Truth*, 542 F.3d at 650.

Although the *Truth* court limited its result to upholding the school's application of its nondiscrimination policy to require the plaintiff student group to remove its faith-based discriminatory membership restrictions, this Court extracts certain principles and applies them to reach its result here. *Truth*, 542 F.3d at 651 ("We hold only that the District did not violate the Act or Truth's First Amendment rights by applying its nondiscrimination policy to require Truth to remove its general membership

provisions"). First, the Court finds CSU's nondiscrimination policy regulates conduct in the form of restrictions on admission to membership in student groups, not the content or viewpoint of their speech. Second, the forum in this case is indistinguishable from the "limited public forum" characterized in *Truth*, dictating the level of scrutiny to be applied to CSU's nondiscrimination in membership restrictions. Third, the Court adopts below certain insights from Judge Fisher's majority holding respecting the expressive association analysis.

### 4. *The Kane Questions*

Defendants urged the Court to await the outcome of the *Kane* appeal before deciding these cross-motions because that case includes more of the issues on more analogous facts than were before the Ninth Circuit in *Truth*. They acknowledge the *Truth* court spent most of its analysis on the Equal Access Act claim, a cause of action not presented in this litigation. "Thus, the only part of *Truth* that is really applicable is the First Amendment analysis, which was admittedly not as in-depth as it might have been, had the court been faced with the additional evidence presented by the parties here in the higher education setting." (Def.'s Suppl. Brief, 3:9–12.) While this is true, the September 9, 2008 concurring opinion amending the *Truth* ruling provides pertinent analytical guidance.

As confirmed in *Truth*, "state action that burdens a group's ability to engage in expressive association [need not] always be subject to strict scrutiny, even if the group seeks to engage in expressive association through a limited public forum." *Truth*, 542 F.3d at 652 (J. Fisher, concurring) (observing "[e]ven assuming . . . Truth's exclusion of non-Christians allows it to engage in speech through expressive association, its exclusion from the ASB program on account of its discrimina-

tory policy does not infringe its rights under the First Amendment"). "[W]hen the state creates a *limited* public forum, like the ASB program at issue here, it may restrict access to that forum so long as the restrictions are 'viewpoint neutral and reasonable in light of the purpose served by the forum,' even if these rules have the effect of limiting a group's ability to engage in protected speech, such as the right to speak, publish on a particular topic or engage in expressive association." *Id.* at 651–52, *quoting Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (emphasis in original). The concurrence continued:

> **When the state restricts access to a limited public forum in a way that interferes with a group's speech or expressive association, however, we apply the lesser standard of scrutiny, even if the same burden on a group's rights outside a limited public forum would be subject to strict scrutiny.** *See Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510 (applying limited public forum analysis to a university policy that excluded a group's access to the school's student activity fund, thereby preventing it from publishing a newspaper). To hold otherwise would accord an act of "pure speech" such as publishing a newspaper-the core of what the First Amendment protects-less protection than an act of expressive association. We find no support for such a proposition, and Truth has identified none. [Footnote omitted.] Truth, of course, has the option of operating as a ... group on school grounds, *see* 524 F.3d at 963, and as such would be able to restrict its membership unfettered by the school's nondiscrimination policy. **If Truth wants the additional benefits that come from participation in the ASB program, however, Truth must comply with the school's reasonable, viewpoint-neutral rules.**

*Truth*, 542 F.3d at 652 (emphasis added); *see Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763–64, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (the court's perspective when assessing viewpoint-neutrality must be the government's purpose, not the reasons the affected group is acting, because the effect on a particular group's perspective or belief system does not by itself render the policy a content- or viewpoint-based restriction subject to heightened scrutiny).

## B. *Factual Background*

The facts of this case are generally not disputed, as evinced by the parties' Joint Statement of Undisputed Facts ("Undisputed Facts"), enumerating 360 discrete facts, filed in conjunction with the cross-motions. (Dkt. No. 72.) The FAC identifies the Plaintiffs and traces the history of their attempts to gain or retain university recognition for their student organizations.

For the six years prior to August 2005, Every Nation Campus Ministries at San Diego State University ("ENCM–SDSU") enjoyed university recognition and its attendant benefits by complying with CSU's nondiscrimination policy while at the same time observing its closely held religious beliefs. (FAC ¶ 98.) In August 2005 ENCM–SDSU submitted a new constitution as part of its application package for renewed university recognition. (FAC ¶¶ 67–72.) That new constitution states that members must be "Christians who have professed their faith in the Lord Jesus Christ," and each officer and member must sign an oath stating they have read, agree with, and believe to be true the Statement of Faith of Every Nation Campus Ministries. (FAC ¶¶ 79, 81.) In addition, "individuals who believe they are innately homosexual, or advocate the viewpoint that homosexuality is a natural part of God's created order, are not permitted to be members or officers."[9]

9. It is not clear whether this exclusion appears in ENCM–SDSU's constitution itself, or

(FAC ¶ 90.) SDSU denied ENCM university recognition in October 2005 due to the language in its constitution and Statement of Faith requiring members and officers to be Christians, on grounds those provisions violate anti-discrimination regulations and the institution's policy requiring that groups not discriminate on those bases as a condition to formal recognition by the university. (FAC ¶¶ 105–110.)

Similarly, ENCM–CSULB had operated as a fully recognized student organization (under the name Victory Campus Fellowship), complying with the CSU nondiscrimination requirements applicable to all student organizations while honoring its closely held religious beliefs. (FAC ¶ 210.) As at SDSU, the group submitted a new constitution in August 2005 as part of its application package for university recognition. CSULB denied ENCM recognition on grounds its constitution and bylaws violated the CSU nondiscrimination policy applicable to all student organizations requesting recognition. (FAC ¶ 214.)

Also in August 2005, the SDSU sorority plaintiff, Alpha Delta Chi, submitted its application for on-campus recognition, along with its constitution and bylaws detailing several membership requirements, including: "personal acceptance of Jesus Christ as Savior and Lord; active participation in Christian service; regular attendance or membership in an evangelical church; and interest in leading others to Christ." (FAC ¶ 123.) Eligibility for an elective office required that candidates have "an active commitment to Jesus Christ as Lord and Savior." (FAC ¶ 124.) The group also excluded from membership any individual "who unrepentantly believes they were created homosexual, or unrepentantly advocates the viewpoint that homosexuality is a natural part of God's cre-

ated order." (FAC ¶ 136.) SDSU denied the sorority's application for official recognition in September 2005, on grounds the requirement that members and officers have a personal commitment to Jesus Christ as Lord and Savior conflicted with university policy requiring that "on-campus organizations not discriminate in membership or membership privileges on the basis of religion." (FAC ¶¶ 140–41.)

The SDSU fraternity plaintiff, Alpha Gamma Omega ("AGO"), had last applied for recognition as an on-campus student organization in September 2004. (FAC ¶ 174.) The bylaws and constitution submitted along with its application reflected the requirement that all officers submit a written statement of their Christian beliefs and experiences and sign a Statement of Faith that publicly professed "a belief in the Lord and Savior Jesus Christ as God and only Savior and give witness to the regenerating power of the Holy Spirit" in their lives, and that members live their lives according to Christian standards of conduct. (FAC ¶¶ 152, 155, 160.) AGO also stated it would exclude from membership, or revoke the membership or leadership position of, any individual who unrepentantly believed they were created homosexual, or unrepentantly advocated the viewpoint that homosexuality is a natural part of God's created order. (FAC ¶ 171.) University recognition was denied because requiring the group's officers to be Christians and to sign and abide by the Statement of Faith violated CSU's policy prohibiting recognized student organizations from discriminating on the basis of religion. (FAC ¶ 176.)

Plaintiffs identify as their common goals: to promote Christian viewpoints; to spread the Christian message of salvation;

is the mandate of a separate Statement on Sexual Morality Standards that ENCM–SDSU

is bound by. (FAC ¶¶ 85–92.)

to mentor their members in the Christian faith; and to role model Christian living. (FAC ¶¶ 73, 75–77, 118, 123, 125–27, 149, 158–61, 185, 187–89.) They represent that while each group pursues these goals in different ways, all believe that to achieve their objectives they must require their members and officers to conform to Christian beliefs and standards of conduct. (FAC ¶¶ 78, 128, 150–51, 190.) Each group also believes that sexual activity is proper only when it takes place between a man and a woman in a marriage relationship, and that sexual conduct outside of marriage by any of its members or officers would undermine its Christian message and testimony on campus. (FAC ¶¶ 73, 75–77, 118, 123, 125–27, 149, 158–61, 185, 187–89.) Plaintiffs argue the U.S. Constitution prohibits CSU from applying the institution's nondiscrimination policy to their groups because of the effects on their fundamental free association, free speech, and religious rights. They seek permanent injunctive relief to enjoin Defendants from denying them official recognition as student organizations and declaratory relief that Defendants' reason for denying them that recognition (i.e., failure to abide by the CSU nondiscrimination policy) is based on a policy that is unconstitutional, on its face and as applied. (FAC ¶¶ 1–2.)

CSU is a public entity acting in a higher education capacity for the State of California. The challenged policy is directed solely towards student groups' membership criteria. To obtain official recognition with attendant benefits, CSU requires that a student organization abide by the institution's nondiscrimination policy and incorporate into its bylaws, and expressly aver in an application for recognition, the group will not discriminate on the basis of any of the enumerated considerations contained

in the policy including, *inter alia*, religion and sexual orientation in the selection of members or officers. The regulations governing nondiscrimination in student organizations from which the policy derives appear at Article 4, Subchapter 4, Chapter 1, Division 5 of Title 5 of the California Code of Regulations ("Code"). CAL.CODE REGS. tit. 5, §§ 41500–41505 (2009) (emphasis added): [10]

[Withholding of Recognition]

No campus shall recognize any fraternity, sorority, living group, honor society, or other student organization which discriminates on the basis of race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability . . . . (tit. 5 § 41500)

[Definition of Recognition]

Recognition as used in this article shall include, but not be limited to, the granting by a campus of any benefit, resource, or privilege whatsoever, or allowing the use of campus facilities, to any such student organization described in Section 41500 of this article. (tit. 5 § 41501)

[Filing Requisites]

Each student organization shall deposit with the Vice President of Student Affairs or equivalent officer of the campus **copies of all constitutions, charters or other documents relating to its policies.** The student organizations shall also deliver . . . **a statement signed by the president or similar officer** of the local student organization **attesting** that the organization has no rules or policies which discriminate on the basis of race, **religion,** national origin, ethnicity, color, age, gender, marital status, citizenship, **sexual orientation,** or disability . . . . (tit. 5 § 41503).

---

**10.** The regulations are apparently enacted by the university trustees, not the state legislature, but the prohibited discrimination language tracks federal and state nondiscrimination laws.

The CSU policy tracks those regulations. The SDSU policy states (emphasis added):

> "**On-campus status will not be granted to any student organization [that] restricts membership or eligibility to hold appointed or elected student officer** positions in the campus-recognized chapter or group on the basis of race, sex, color, age, religion, national origin, marital status, **sexual orientation,** physical or mental handicap, ancestry, or medical condition, except as explicitly exempted under federal law."

The CSULB policy states (emphasis added):

> "Prohibited Discrimination is treatment of an individual or class of individuals which denies opportunity, participation or benefit on any of the following grounds: age, ancestry, color, covered U.S. military service, ethnicity, gender, marital status, medical condition, national origin, physical or mental disability, pregnancy, race, **religion,** [and] **sexual orientation.**"

The SDSU and CSULB campuses of CSU each recognize over 100 student organizations. Recognized student organizations are eligible for financial benefits, access to certain areas on campus reserved for those groups, subsidized rental of meeting facilities, and the like.[11] CSU represents it recognizes any student organization that abides by its institutional policy predicated on the system-wide application of Title 5 of the Code prohibiting discrimination in membership criteria based on race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation or disability, but it cannot accord university recognition to organizations that refuse to comply with CSU's nondiscrimination policy. Plaintiffs admit they discriminate on the basis of religion, sexual orientation, and marital values in their selection of members and officers. They do so by requiring that their members be Christians, reject homosexuality, and not engage in sex outside of marriage—policies they characterize as an exercise of their First Amendment expressive association rights. This lawsuit arises from Plaintiffs' refusal to provide the nondiscrimination assurances CSU requires for recognized status and the denial on that basis of recognized status. Plaintiffs contend CSU's insistence that they adhere to university policy infringes their constitutional rights.

### 1. Religious Versus Sexual Orientation Discrimination

At the outset, the Court wishes to highlight an analytical distinction between the religious discrimination and the sexual orientation discrimination that cost the Plaintiffs their official recognition as student organizations. There is no denying that the Plaintiffs discriminate on the basis of religion; only Christians who profess their faith are welcome. It is not obvious to the Court, however, that Plaintiffs discriminate against homosexuals. Taking them at their word, they discriminate not against homosexuals *per se* but against individuals, many of whom may be homosexual, with a particular view of homosexuality: "individuals who believe they are

---

**11.** Particular benefits available only to officially-recognized student groups at SDSU include, among other things: rental of Aztec Center/Student Union facilities; informational tabling at Aztec Center; student organization weekly business meetings at Aztec Center; rental of instructional technology services equipment; placement of banners on Aztec Center walkways; posting of signs at Aztec Center walkway; posting of signs at Aztec Center food court; welcome week; explore SDSU; student organization funding; and a listing on the universities' official website. *See generally* Undisputed Facts ¶ 44.

innately homosexual, or advocate the viewpoint that homosexuality is a natural part of God's created order, are not permitted to be members or officers of ENCM–SDSU."[12] (FAC ¶ 90.) That policy does not necessarily exclude *all* gays or *only* gays.[13] Indeed, the Plaintiffs have conceded that "[a]n individual who may have engaged in homosexual conduct in the past but has genuinely repented of that conduct would not be prevented from becoming a member or serving as an officer of ENCM–SDSU based on that past conduct." (FAC ¶ 91.) Even more to the point, presumably neither would a practicing homosexual be prevented from becoming a member of ENCM–SDSU so long as he or she viewed homosexual conduct as transgressive of natural law and wanted ENCM–SDSU's tenets of sexual morality to sink in.

Of course, this all begs the definitional question of what it means to be a "homosexual" and especially what that term means in the context of SDSU and CSULB's nondiscrimination policies. But the formal point remains that homosexuals are not categorically excluded from membership in the Plaintiff student groups. In no way, it is worth adding, is the Court suggesting that groups be able to dodge compliance with nondiscrimination policies, or antidiscrimination law more generally,

merely by rebranding an identity requirement as a belief requirement. Clearly, Plaintiffs would still be in the boat they are in even if they did not explicitly require members to be Christians but instead to believe a laundry list of things about Jesus Christ and the Bible. Those beliefs constitute the Christian identity. When it comes to Plaintiffs' collective sexual morality, suffice it to say there is more breathing room between the identity "homosexual" and the particular set of beliefs about homosexuality that members are required to espouse.

Although the Court views this distinction as an important one, it does not affect the outcome in this case. The fact remains that Plaintiffs' membership policies with respect to non-Christians are discriminatory, and the record does suggest that these policies were the greater evil that ultimately doomed their applications for recognized status. For example, the Assistant Dean of Students at SDSU who was in charge of reviewing student organization applications, constitutions, and bylaws for compliance testified that ENCM–SDSU was denied recognized status because its constitution requires members to be Christians and to sign and abide by ENCM–SDSU's Statement of Faith. (FAC ¶ 110.) The Statement of Faith says nothing about homosexuals. (FAC ¶ 82.)[14]

---

**12.** The other Plaintiff student groups have similar language in their constitutions and bylaws. FAC ¶ 136 (Alpha Delta Chi), FAC ¶ 171 (Alpha Gamma Omega), FAC ¶ 202 (ENCM–CSULB).

**13.** This point is developed in a law review article that is cited favorably by the concurrence of Judge Wardlaw and Judge Fisher in the Ninth Circuit's denial of rehearing *en banc* in *Truth*. *See* Eugene Volokh, *Freedom of Expressive Association and Government Subsidies*, 58 Stan. L. Rev.1919, 1938 (2006) ("[A] religious group (say, a Catholic group) that condemns homosexuality might demand that its members share those views. Such a

demand would be neither religious discrimination nor sexual orientation discrimination, but only discrimination based on holding a certain viewpoint that secular people could hold as well as religious ones. But such a group rule wouldn't just exclude practicing homosexuals, or at least those practicing homosexuals who believe that homosexuality is proper—it would also exclude heterosexual Catholics who disagree with church teachings on this issue").

**14.** For contrast, ENCM–CSULB was denied recognized status when the relevant authority declined to recognize an organization that

## II. DISCUSSION

### A. *Summary Judgment*

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. ("Rule") 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("If reasonable minds could differ," judgment should not be entered in favor of the moving party); *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982) ("A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth"). However, summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

### B. *Framing The Issues*

Naturally, the parties disagree on how to frame the issues presented in this case. Plaintiffs contend the U.S. Constitution prohibits CSU from applying its nondiscrimination policy to them because to do so infringes their First Amendment rights. They characterize the case as government exclusion of a private group from a state-created *public forum* for First Amendment expression, and the policy as "forced inclusion" that both infringes their right to expressive association and compels speech. In their preliminary injunction motion, Plaintiffs formulated the question as: "can religious organizations participate in the life of public universities without being discriminated based on a student's religion

forced to give up their distinctive religious character?" (Pl.'s Mot., 1:2.)

In particular, Plaintiffs argue the CSU nondiscrimination policy is unconstitutional, as drafted and as applied to them, because of the impact on their right to associate without the "forced inclusion" of people who do not share their core religious beliefs. They characterize the policy as requiring them to forego the exercise of their fundamental rights to free speech and forcing them to engage in compelled speech through changes to their constitutions and assent to the universities' nondiscrimination principles. They allege the policy targets religion (an alleged free exercise violation) and is not neutral towards religion. They also contend CSU does not uniformly enforce the policy, in violation of their equal protection rights, because it allows other religious student groups to make exclusions based on religion yet remain recognized organizations. Plaintiffs assert they have a constitutionally protected right to violate CSU nondiscrimination policy and still receive the benefits of university recognition. They contend denial of official recognition excludes them from the mainstream of campus life and seriously hampers their ability to recruit members and to promote their Christian viewpoints on campus, a location they characterize as a public forum. On that basis, they say the policy should be subject to strict scrutiny.

Defendants and *amici* disagree with Plaintiffs' framing of the issues. They contend the question is not whether Plaintiffs are being denied the right to freely associate, speak, and act however they wish, on campus or off. Rather, they characterize this as a "benefits" case and the challenged nondiscrimination policy as regulating conduct, not speech, on its face and as applied. Defendants dispute their nondiscrimination policy raises issues of and/or sexual orientation. FAC ¶ 222.

"compelled speech" or "forced inclusion" because CSU does not direct any student organization to accept members whose unwelcome affiliation would affect their message. They contend the regulations do not prevent plaintiffs from exercising their First Amendment rights to expressive association or free exercise. In opposition to the preliminary injunction motion, Defendants identified the question presented by this litigation as: "whether a public university may be forced to give its aid and endorsement to discriminatory conduct that contravenes the university's stated educational mission." (Def.'s Pre. Inj. Opp., 1:16–18.) CSU claims to recognize any student organization that satisfies the institution's legitimate interest in prohibiting membership discrimination on the basis of race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability—as imposed by the Code. Defendants argue that the speech forum at issue is a limited forum, and that strict scrutiny is therefore inappropriate; the Court need only find that the nondiscrimination policy is reasonable, viewpoint-neutral, and evenly applied in order to uphold the policy and its application to Plaintiffs.

### C. Forum Analysis and Standards of Review

█ The Court must, as a threshold matter, decide what kind of "forum" for speech CSU's student organization program is. That will determine the level of scrutiny that the Court applies to CSU's nondiscrimination policy as it affects the Plaintiffs' First Amendment interests. Forum analysis is therefore critical, and in this case it is likely outcome-determinative.

In characterizing a forum, courts consider "the selectivity with which the forum was open to particular forms of expression." *Hopper v. City of Pasco*, 241 F.3d 1067, 1078 (9th Cir.2001), *citing Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (*"Forbes"*). "[T]he more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public." *Id.* Courts also consider "whether the expressive activity is consistent with the principal function of the forum," an inquiry that "focuses on the specific space to which the would-be speaker seeks access" while taking into account "the context of the property as a whole." *Id., citing Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 804, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), *DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958, 968 (9th Cir.1999).

█ The two broadest fora categories are public and non-public.[15] Within the first category, courts distinguish between "traditional/open" public fora and "designated" public fora. *See Forbes*, 523 U.S. at 677–79, 118 S.Ct. 1633. "Traditional public fora" are locations such as public streets and parks that "by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45, 103 S.Ct. 948. When the government intentionally dedicates its property to expressive conduct, it also creates a public forum. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439 (such "designated public fora" are created when the government "intentionally opens a nontraditional forum for public discourse"). A designated public forum generally is a more limited area created by purposeful government action, not necessarily defined by physical site, and exists for First Amendment purposes

---

**15.** A "non-public" forum is neither a traditional public forum nor one where the government has chosen to create a designated public forum, so restricting access does not give rise to constitutional concerns. *See Forbes*, 523 U.S. at 678, 118 S.Ct. 1633.

when "the government intentionally opens up a nontraditional forum for public discourse." *Hopper*, 241 F.3d at 1074, *quoting DiLoreto*, 196 F.3d at 964–65. The government creates a designated public forum by designating "a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Berry v. Dept. Soc. Servs.*, 447 F.3d 642, 653 n. 10 (9th Cir. 2006), *citing Perry*, 460 U.S. at 45–46, 103 S.Ct. 948. Governmental restrictions in traditional public fora and in designated public fora are subject to strict scrutiny.[16]

█ In addition to traditional and designated public fora, there are also "limited public fora." *Hopper*, 241 F.3d at 1074. The contours of these terms have not always been clear. *DiLoreto*, 196 F.3d at 965 n. 4. Although "some courts and commentators refer to a 'designated public forum' as a 'limited public forum' and use the terms interchangeably," in the Ninth Circuit there is a difference between them. *Id.* "[A] limited public forum is a subcategory of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.'"

*Hopper*, 241 F.3d at 1074–75, *quoting DiLoreto*, 196 F.3d at 965.

█ On college and university campuses, courts have recognized two types of designated public fora: non-limited and limited. Governmental restrictions in traditional public fora and non-limited designated fora are subject to a stricter level of scrutiny than restrictions in limited designated (or "limited") fora. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Speakers can be excluded from the former only when necessary to serve a compelling state interest and when the exclusion is narrowly drawn to achieve that interest. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. As various commentators have demonstrated, courts often decide constitutional challenges to restrictions in the context of higher education by adopting limited public forum principles. These principles allow for content restrictions, but prohibit limitations on particular viewpoints. *See, e.g.*, Derek P. Langhauser, *Free and Regulated Speech on Campus: Using Forum Analysis for Assessing Facility Use, Speech Zones, and Related Expressive Activity*, 31 J.C. & U.L. 481,485 (2005) ("Langhauser");[17] David Aronof-

16. The government's ability to limit speech in a traditional or designated public forum is highly circumscribed: Content-based regulation is justified only when "necessary to serve a compelling state interest and [when] it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45, 103 S.Ct. 948 (content-neutral restrictions regulating time, place, and manner of speech are permissible as long as they are "narrowly tailored to serve a significant government interest, and [they] leave open ample alternative channels of communication").

17. In the college and university context for First Amendment restrictions,

three basic rules of guidance emerge. First, the right of free expression is widely protected. Second, the right is not absolute. Third, courts frequently walk through

several analytical steps and apply "forum analysis" to balance this right against an institution's legitimate administrative and pedagogical interests. Under forum analysis, courts identify the location, either literal or figurative, where the speech will be expressed; the subject of the message; and the source, timing, and effect of any restrictions.

Langhauser, 31 J.C. & U.L. at 485, citing as representative cases applying forum analysis to resolve speech claims in the context of financial support of student organizations: *Bd. of Regents of the Univ. of Wis. v. Southworth*, 529 U.S. 217, 229–30, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510; *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1038–39 (9th Cir.1999); *Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d 1543, 1548 (11th

sky, *Higher Education Student Elections and Other First Amendment Student Speech Issues: What Flint v. Dennison Portends*, 34 J.C & U.L. 637 (2008).

> An institution does not create a designated public forum by inaction or by permitting limited discourse, but only by intentionally opening a location for public discourse. [Footnote omitted.] Nor does an institution create a designated public forum when it allows selective access for individual speakers, rather than general access for a class of speakers. [Footnote omitted.] Finally, an institution does not create a designated public forum when it merely reserves access for a particular class of speakers and then still requires individual permission for use.

Langhauser at 497, *citing Forbes*, 523 U.S. at 677–79, 685, 118 S.Ct. 1633 and *Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510.

■■■ Unlike a "non-limited" designated forum, which doesn't limit who can speak or what can be discussed, a "limited" designated forum restricts access to certain groups and permits discussions only on certain topics. In these fora, as in non-public fora, the government violates the First Amendment only "when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439. In a limited public forum, however, "restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *DiLoreto*, 196 F.3d at 965.[18] *See also Cogswell v. City of Seattle*, 347 F.3d 809, 814 (9th Cir.2003) ("[T]he State can restrict access to a limited public forum as long as (1) the restriction does not discriminate according to the viewpoint of the speaker, and (2) the restriction is reasonable"), *citing Perry*, 460 U.S. at 46, 103 S.Ct. 948. In a limited public forum, exclusions are evaluated in the same way as under nonpublic forum analysis. *Truth*, 542 F.3d at 652 (Fisher, J. concurring) ("When the state *restricts access to a limited public forum* in a way that interferes with a group's speech or expressive association, ... we apply the lesser standard of scrutiny, even if the same burden on a group's rights *outside* a limited public forum would be subject to strict scrutiny"), *citing Rosenberger*, 515 U.S. at 829–30, 115 S.Ct. 2510.

■■■ The guiding axiom here is that "once the government has chosen to permit discussion of certain subject matters, it may not then silence speakers who address those subject matters from a particular perspective." *Cogswell*, 347 F.3d at 815. " '[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.' " *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), *quoting City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). *See also Good News Club*, 533

---

Cir.1997) (applying *Rosenberger* to hold funding of student groups creates a limited public forum).

18. The *DiLoreto* court rejected the plaintiffs' free speech challenge to a school district's policy to screen potential advertisements before approving them to be posted on a baseball field fence, and specifically their challenge to the district's refusal to post a Ten Commandments advertisement, because allowing the sign "would be viewed as a promulgation of certain religious views," and would foster excessive entanglement with religion due to the school's exposure to "the possibility of protests, other religious factions seeking equal space, and the possibility of lawsuits." *DiLoreto*, 74 Cal.App.4th 267, 277, 87 Cal.Rptr.2d 791 (Cal.Ct.App.1999). While useful for its explication of First Amendment principles, the *DiLoreto* facts are quite dissimilar from those presented in this case.

U.S. at 107–09, 121 S.Ct. 2093 (the government can exclude certain subject matter or activities it deems inconsistent with the forum's purpose, so long as it does not discriminate against a speaker's viewpoint).[19] Although the "coherence of the distinction between 'content discrimination' and 'viewpoint discrimination' is tenuous," content discrimination occurs when the government chooses the subject matter that may be discussed, while viewpoint discrimination is directed to specific positions taken on the matter. *Giebel v. Sylvester*, 244 F.3d 1182, 1188 n. 10 (9th Cir. 2001) (recognizing that "the level at which 'subject matter' is defined can control whether discrimination is held to be on the basis of content or viewpoint").

### 1. *Conclusion*

 After all of this First Amendment doctrine, the question remains how best to classify CSU's student organization program for First Amendment purposes, given that it is the relevant "forum" at issue in this case. The Court finds that *Truth* is binding authority on this question: the program is a limited public forum. *See*

*Truth,* 542 F.3d at 648–49. It was created by designation, and participation is limited to those groups that agree to abide by CSU's nondiscrimination policy. (That policy is itself a requirement imposed on CSU by law as a state school receiving federal funds.) The Court therefore rejects Plaintiffs' argument that CSU's nondiscrimination policy is subject to strict scrutiny. CSU may restrict access to its recognized student organization forum so long as the restrictions are viewpoint-neutral and reasonable in light of the purposes served.

### D. *First Amendment Expressive Association Burden*

Acts of expressive association are protected forms of speech:

> Expressive association is simply another way of speaking, only the group communicates its message through the *act of associating* instead of through an act of "pure speech" such as publishing, marching, speaking or performing. *See Dale,* 530 U.S. at 648, 120 S.Ct. 2446 (holding that the First Amendment protects a group's ability to exclude mem-

---

**19.** In *Good News Club,* the court held a school district engaged in impermissible viewpoint discrimination in refusing to allow a Christian club to offer a religious perspective on moral and character development in an afterschool forum, while opening the school facilities to wide community involvement for use "pertaining to the welfare of the community" by groups that promoted the moral and character development of children. 533 U.S. at 108, 110, 121 S.Ct. 2093. The *Good News Club* court applied *Rosenberger* and *Lamb's Chapel* to find the school district had discriminated on the basis of viewpoint by denying the plaintiff club the opportunity to teach moral and character development to children from a religious perspective while permitting other groups to engage in such activity from other perspectives. *Id.* at 109–112, 121 S.Ct. 2093 ("What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of

Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their lessons"). Although some "quintessentially religious" speech (such as a call to prayer) may be part of a plaintiff's activities, *Good News Club* makes clear that such speech in furtherance of communicating an idea from a religious point of view cannot be grounds for exclusion. *Id.* at 111. While a policy prohibiting religious worship services in a library meeting room can be held a permissible exclusion of a category of speech that is meant to preserve the purpose behind the limited public forum, that prohibition could not be applied to bar the group from engaging in secular activities that expressed a religious viewpoint on subject matters otherwise permitted. *See Faith Ctr. Church Evangelistic Ministries v. Glover,* 480 F.3d 891 (9th Cir. 2007).

bers, if including such members would "impair the ability of the group to express those views, and only those views, that it intends to express"). There is no question that acts of expressive association are protected forms of speech under the First Amendment. *See id.* at 656, 120 S.Ct. 2446; *Hurley* [*v. Irish–American Gay, Lesbian and Bisexual Group of Boston* ], 515 U.S. [557,] 579, 115 S.Ct. 2338 [132 L.Ed.2d 487 (1995) ].

*Truth,* 542 F.3d at 652 (emphasis in original).

Plaintiffs argue that requiring them to comply with CSU's nondiscrimination policy infringes their right of expressive association. To Plaintiffs this is not a "benefits" case, as Defendants would have it, but rather a compelled membership ("forced inclusion") case. Relying on a since-superseded version of *Truth* that nonetheless summarizes good law, they advance two theories of how their associational rights have been infringed. (Pl.'s Suppl. Brief, 1: 1–13.) The first relies upon *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) and maintains that accepting non-Christians would incidentally affect Plaintiffs' expressive conduct. (Pl.'s Suppl. Brief, 1 n.1.) The second relies upon a string of forced inclusion cases in which a regulation either (1) forces an organization to accept as members individuals whose mere presence would send a message inconsistent with the organization's own views, or (2) forces an organization to accept leaders or voting members whose views are inconsistent with those of the original organization members. (Pl.'s Suppl. Brief, 4: 19–26.) Those cases are *Roberts v. Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express

only those views that brought them together"); *Hurley,* 515 U.S. at 572–79, 115 S.Ct. 2338 (inclusion of pro-homosexual contingent into a private association's parade would impermissibly impact the group's message in violation of freedom of expressive association); and *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 644, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (holding application of New Jersey's public accommodations law to require the "forced inclusion" in the Boy Scouts of an "avowed homosexual and gay rights activist" as an assistant scoutmaster unconstitutionally infringed the group's expressive association rights).

Plaintiffs argue that CSU's nondiscrimination policy is presumptively unconstitutional under both theories and that summary adjudication is appropriate in their favor. They contend they have shown that "including unwanted members would conflict with the beliefs and viewpoints the association came together to advocate." (Pl.'s Suppl. Brief, 1:15–17.) In reliance on *Dale,* they argue:

> [T]he unwanted members would participate on an "equal footing" with members of the Plaintiff student groups, all of whom bear the responsibility of advocating Christian beliefs and modeling the Christian conduct standards that form the basis of the Plaintiff associations' Christian identities and public expression.... The forced inclusion required here "forces[s] the [Plaintiffs] to send a message ... that conflict[s] with the 'sincerely' held views of the organization[s]," [*Truth,* 499 F.3d at 1014], (quoting *Dale,* 530 U.S. at 653 [120 S.Ct. 2446] ), and thus plainly constitutes a violation of Plaintiffs' right to association.

(Pl.'s Suppl. Brief, 4:12–18.)

Expectedly, Defendants disagree and argue that Plaintiffs' expressive association

claim must fail as a matter of law. They rely in part on *Evans v. City of Berkeley*, 38 Cal.4th 1, 10, 40 Cal.Rptr.3d 205, 129 P.3d 394 (2006) *cert. denied*, 549 U.S. 987, 127 S.Ct. 434, 166 L.Ed.2d 330 (Oct. 16, 2006), which upheld a municipality's requirement that nonprofit community service organizations seeking a subsidy must pledge not to discriminate on the basis of a person's race, color, religion, ethnicity, national origin, age, sex, sexual orientation, marital status, political affiliation, disability, or medical condition.[20] Defendants assert that *Dale* does not apply when "a private group is not being directly forced to admit a member whose presence would impair its message, but, rather, is seeking access to a nonpublic forum or government benefit that is conditioned upon compliance with a reasonable and viewpoint-neutral condition of nondiscrimination." (Dkt. No. 52, 9:3–6) (*citing Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 91 (2nd Cir.2003)). Defendants also maintain that even if *Dale* applied here, Plaintiffs' expressive association claim must fail because CSU's nondiscrimination policy is justified by a compelling government interest. (Def.'s MSJ Mem., 13:18–24).

In *Dale*, New Jersey attempted to force a private group to admit a leader whose very presence would have been antithetical to its message. In contrast, here Plaintiffs are not being forced to associate with anyone. Indeed, the *Dale* Court expressly cautioned that its holding "is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Dale*, 530 U.S. at 653, 120 S.Ct. 2446. Indeed, if Plaintiffs are in fact forced to welcome "unwanted members" such as non-Christians or those tolerant of homosexuality, the likely message their presence will send is that Plaintiffs are reluctantly complying with a nondiscrimination policy, not that they have tempered their religious and moral views.[21]

 This Court has already decided that CSU's student organization program is a limited public forum, meaning restrictions on speech need only be viewpoint-neutral and reasonable in light of the purposes of the forum. The Court finds that CSU's nondiscrimination policy burdens Plaintiffs' expressive activity, if at all, only incidentally, while at the same time furthering a legitimate interest in providing all students with the opportunity to participate in the full range of student activities supported by the university. Plaintiffs are, after all, student organizations that seek official recognition from public universities. "[W]hen regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" *Clingman v. Beaver*, 544

---

**20.** The *Evans* court held, in a dispute between the Sea Scouts and the city over marina berths, that compliance with the city's mandate of nondiscrimination did not require plaintiffs "to espouse nor to denounce any particular viewpoint nor to form or break any association or affiliation," but only to provide assurances of their adherence to the policy in connection with the subsidized use of the berths. *Evans*, 38 Cal.4th at 11, 40 Cal. Rptr.3d 205, 129 P.3d 394.

**21.** This message-based approach to freedom of association claims has been criticized by one scholar who has argued that the harm in compelled association has less to do with "confusion in the transmission of a group's message" and more to do with interfering with "the generation and germination of thoughts and ideas." *See* Seana Valentine Shiffrin, *What is Really Wrong With Compelled Association?*, 99 Nw. U.L. Rev. 839, 840–41 (2005). The Court agrees. The message-based approach, a product of Justice Brennan's majority decision in *Roberts*, likely endures, among other reasons, because the First Amendment is more sympathetic to messages than thought processes.

U.S. 581, 587, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (*quoting Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997)). Unlike the Defendant in *Dale*, Defendants here do not require Plaintiffs to admit as members persons they would prefer to exclude, but only require Plaintiffs to open their membership to all students if they want the university's imprimatur and the benefits of recognition. The restriction is reasonable in light of the legitimate nondiscriminatory policy sought to be advanced in the public higher education arena.[22] CSU's nondiscrimination policy survives Plaintiffs' constitutional challenge on expressive association grounds as a matter of law, and summary adjudication of this issue is **GRANTED** in Defendants' favor. *See Truth*, 542 F.3d at 651–52 (Fisher, J. concurring).

### E. *First Amendment Free Speech Burden*

Not only does CSU's nondiscrimination policy require Plaintiffs to open their membership and leadership to students regardless of religion, sexual orientation, or marital status, CSU also requires them to sign a statement certifying that they will observe it and incorporate it into their constitution and bylaws. (Pl.'s MSJ Mem., 22: 10–19.) If they do not, they will lose recognized student organization status. In their view, this compulsory assent to CSU's nondiscrimination policy is unconstitutional compelled speech. They accuse the requirement of forcing them "to express a message they disagree with in the same way that the antidiscrimination law required the parade organizers to alter their speech in *Hurley*."[23] *Id.* 22:23–25.

The Court has rejected the Plaintiffs' argument that the Court should apply strict scrutiny in this case, given that CSU's student organization program is a limited public forum. "In a limited public forum, a lenient reasonableness standard applies to determine the validity of government regulations" when challenged on free speech grounds. *Cogswell*, 347 F.3d at 814, *citing Cornelius*, 473 U.S. at 797, 105 S.Ct. 3439; *Perry*, 460 U.S. at 46, 103 S.Ct. 948; *Hopper*, 241 F.3d at 1074. Plaintiffs argue that Defendants fail that

**22.** In the non-public forum context, the Second Circuit has observed: "As a general matter, all antidiscrimination laws that govern organizations' membership or employment policies have a differential and adverse impact on those groups that desire to express through their membership or employment policies viewpoints that favor discrimination against protected groups." *Wyman*, 335 F.3d at 93 (discussing non-public forum and unconstitutional conditions case holdings). If the purpose of the regulation is not to "impose a differential adverse impact upon a viewpoint," application of the nondiscrimination law to exclude a discriminatory group from a nonpublic forum does not violate the First Amendment. *Id.* at 94.

**23.** The *Truth* court contrasted *Hurley*, where the court held a state law violated the First Amendment because it required parade organizers to allow a gay, lesbian, and bisexual contingent to march in the parade whose mere presence behind the organizer's banner conflicted with the organizer's "point of view." *Hurley*, 515 U.S. at 557, 115 S.Ct. 2338. The *Truth* court also contrasted two other "forced inclusion" cases: *Dale*, 530 U.S. at 650, 120 S.Ct. 2446 (holding a state nondiscrimination law requiring the Boy Scouts to admit gay-rights activists violated the First Amendment because it "force[d] the organization to send a message ... that [it] accepts homosexual conduct as a legitimate form of behavior," a message that conflicted with the "sincerely" held views of the organization) and *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 69–70, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (upholding the Solomon Amendment against a *Dale* challenge on the ground that the military recruiters required to be admitted to law schools "come on to campus for the limited purpose of trying to hire students— not to become members of the school's expressive association").

test, thereby aligning themselves with the line of cases exemplifying the principle that when the government "compels affirmance of a belief with which the speaker disagrees," it acts unconstitutionally. (Pl.'s MSJ Mem., 22:3–9, *quoting Hurley*, 515 U.S. at 572–73, 115 S.Ct. 2338 (government could not compel parade organizers to alter their speech by including marchers whose message they did not endorse)).

Defendants argue the CSU nondiscrimination policy regulates conduct, not speech, and that it permissibly imposes only reasonable, viewpoint-neutral rules on participation in a limited public forum. (Def.'s MSJ Mem., 13–17.) "[T]he critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not," a distinction that "permits schools to regulate student conduct, even if it incidentally affects student expression." *Healy*, 408 U.S. at 192, 92 S.Ct. 2338. The *Healy* court concluded "the benefits of participation in the internal life of the college community may be denied to any group that reserves the right to violate any valid campus rule with which it disagrees." *Healy*, 408 U.S. at 193–94, 92

S.Ct. 2338. Similarly, the *Truth* court found the plaintiffs were denied ASB status, at least in part, not because of "the religious 'content of the speech,'" but rather because of its discriminatory membership criteria. *Truth*, 542 F.3d at 645. *Healy* and *Truth* are informative here.

 The Court finds the Ninth Circuit in *Truth* has, for purposes of First Amendment analysis, determined that CSU's nondiscrimination policy is a regulation of conduct, not speech or associative expression. Rational basis scrutiny therefore applies, and the issue is to be decided under the *Evans* and *Wyman* lines of cases rather than the *Dale* and *Roberts* lines as Plaintiffs urge.[24] The Court finds that Defendants do not infringe Plaintiffs' free speech rights, either by compelling speech or regulating their viewpoint. Accordingly, summary adjudication of the free speech issues is **GRANTED** in Defendants' favor.

### F. First Amendment Free Exercise Burden

According to Plaintiffs, CSU's nondiscrimination policy is not viewpoint-neutral

---

**24.** Plaintiffs urge the Court not to rely on *Evans* and not to be swayed by *Kane*, arguing in particular that *Kane* was "wrongly decided" in finding the Supreme Court's expressive association decisions such as *Dale* are inapposite. They argue the *Kane* court's view that *Dale* and similar Supreme Court cases do not apply "unless there is a direct compulsion of a group to include members that would change its message" is "inconsistent with First Amendment Rights." (Pl.'s MSJ Mem., 12:3–5.) The Ninth Circuit has yet to support Plaintiffs' contention. Plaintiffs also argue "voluntary exclusion from the forum because a group does not want to have its message altered by forced inclusion of members who do not share the group's views is not a constitutionally acceptable choice." (Pl.'s MSJ Mem., 12:6–10.) Plaintiffs also rely on *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 872–73 (2d Cir.1996). (Pl.'s MSJ Mem.,

14:8–18) ("absent a showing of invidious discrimination or material disruption, 'when a sectarian religious club discriminates on the basis of religion for the purpose of assuring the sectarian religious character of its meetings, a school must allow it to do so'"). Plaintiffs also rely on the Eighth Circuit cases *Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004) and *Cuffley v. Mickes*, 208 F.3d 702, 709 (8th Cir.2000) to assert "the Second and Eighth Circuits are in stark disagreement with the district court in *Kane*," because those Circuits concluded "religious groups could not be excluded from a forum for First Amendment activity on the basis of the group's membership criteria." (Pl.'s MSJ Mem., 13:4–14.) The Ninth Circuit has not yet decided the *Kane* appeal, and the very issues presented here will not be authoritatively resolved until that opinion issues.

and not generally applicable, and is therefore presumptively unconstitutional under the Free Exercise Clause. In particular, they allege of the policy: (a) it targets religious groups on their face and as applied, subjecting it to strict scrutiny; (b) it is not generally applicable because CSU recognizes a few other student groups that discriminate on grounds forbidden by the policy; (c) it imposes a substantial burden on Plaintiffs' beliefs and practices by requiring them to accept as members students who disagree with their message; and (d) this is a "hybrid rights" case implicating both the Free Exercise Clause and freedom of speech and religion.

Defendants argue Plaintiffs' free exercise claim must fail as a matter of law because CSU's nondiscrimination policy is viewpoint-neutral, generally applicable, and rationally related to a legitimate public interest. Even if strict scrutiny were to apply, Defendants say, the nondiscrimination policy is narrowly tailored to advance a compelling governmental interest: promoting inclusivity and combating discrimination.

■■■■■■ "A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief.'" *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir.2004), *quoting Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). The Free Exercise Clause of the First Amendment is not violated by neutral laws of general application, even if the restriction prohibits conduct that is prescribed by an individual's religion or has the effect of burdening a particular religious practice.

■■■■ Nor is CSU guilty of religious viewpoint discrimination merely because it does not allow the Plaintiffs to discriminate on the basis of their own religious beliefs. It is true that "free exercise claims implicating other constitutional protections, such as free speech, could qualify for strict scrutiny review even if the challenged law is neutral and generally applicable." *Am. Family Ass'n v. City & County of S.F.*, 277 F.3d 1114, 1124 (9th Cir.2002). Not here, however. In order to make out such a hybrid claim, "a free exercise plaintiff must make out a colorable claim that a companion right has been violated." *Id.* (citation omitted). Plaintiffs have not done that. As discussed above, Defendants had a rational basis for drafting and implementing their nondiscrimination policy. Even if strict scrutiny applied, the Court would find enforcement of the nondiscrimination policy against an organization seeking to exclude individuals on the basis of such criteria as religion or sexual orientation to be no greater a restriction on that group's free speech or free association rights than necessary to achieve the state's interest in prohibiting discrimination.

For all the foregoing reasons, summary adjudication of the Free Exercise Clause cause of action is **GRANTED** in Defendants' favor.

### G. *Fourteenth Amendment Equal Protection Challenge*

In denying Defendants' motion to dismiss the equal protection claim, this Court held the CSU nondiscrimination policy is facially neutral, for the reasons discussed in the Order. (Dkt. No. 37, 12–14, 14: 20–21) ("Only an actionable disparate impact evidentiary showing will save the [Equal Protection] claim"). The Court also defined "the appropriate 'similarly situated' group comparable to Plaintiffs" for purposes of equal protection analysis to be "those student organizations denied recog-

nized status because they choose not to abide by the nondiscrimination policy—*i.e.*, those who restrict membership by discrimination in consideration of *any* of the enumerated criteria" articulated in the challenged policy. (Dkt. No. 37, 17:14–17.) Plaintiffs disagree with that definition,[25] but applying it, they acknowledge they must demonstrate that CSU has granted recognition to student groups who have membership criteria that violate CSU's nondiscrimination policy in order to prevail on their equal protection claim. Defendants argue that in order to make the required showing, Plaintiffs must prove discriminatory intent. Plaintiffs counter that discriminatory intent must be presumed any time a government classification infringes on a fundamental right. (Pl.'s SJ Opp., 23–24.)

Plaintiffs contend CSU enforces its nondiscrimination policy in a manner that singles them out for disparate treatment and thereby infringes their fundamental rights. It does so, they say, by denying them recognized status because of their requirement conditioning membership on an affirmation of Christian faith, while simultaneously recognizing similarly situated student groups. (*See* FAC ¶¶ 272–74.) The Court has disposed of the forum characterization dispute and, simultaneously, of the review standard dispute by finding the recognized student organization forum is a limited public forum wherein access restrictions are subject only to rational basis scrutiny.

The issues presented must be framed from the perspective of the policy-maker. The Court has found the challenged policy is constitutional on its face. Of course, other groups are permitted to restrict their membership to those sharing common beliefs, but that does not resolve the question presented here: whether the nondiscrimination policy is a permissible restriction on student groups seeking official recognition from CSU and the benefits that come with that recognition. Defendants argue Plaintiffs' equal protection claim must fail as a matter of law because they are not treated differently than any other similarly situated student organization with respect to the nondiscrimination policy, and because they cannot prove discriminatory intent.

■ The Court need not reach the "intent" issue because there has been no showing to create a triable issue of material fact whether CSU has recognized any student organization whose members, like these Plaintiffs, refuse to comply with the nondiscrimination policy. Absent a showing of a non-neutral application of the policy, the premise for an equal protection claim is lacking. The Court rejects Plaintiffs' equal protection challenge on the undisputed record before it. Accordingly, summary adjudication of the issue is *GRANTED* in favor of Defendants.

## III. CONCLUSION AND ORDER

The question presented in this litigation, on the evidentiary record before the Court, is whether CSU may constitutionally condition official recognition as a student organization—and the benefits that come with it—on the requirement that the organization not discriminate on the basis of "race, religion, national origin, ethnicity, color, age, gender, marital status, citizenship, sexual orientation, or disability." The Court holds CSU may do so. The Court finds as a matter of law that the CSU student organization program is a

---

**25.** Plaintiffs want to be considered "similarly situated to a class of student groups seeking official recognition that do not invidiously discriminate." (Pl.'s SJ Opp., 23 n.10.) Howeverer, the nondiscrimination policy at issue is broader than traditional "invidious discrimination" factors.

limited public forum to which the state may restrict access as long as the restrictions are reasonable and viewpoint-neutral in light of the purpose served by the forum, which they are. The Court further finds the First Amendment burdens imposed by the policy are viewpoint-neutral and uniformly applied to all clubs irrespective of their particular viewpoints. Accordingly, Plaintiffs' free association, free speech, and free exercise rights are not impermissibly infringed by the policy, nor is there any evidence that Plaintiffs have been treated inequitably in their exclusion from the forum due to their discriminatory membership criteria.

While it is undeniable that SDSU's and CSU's nondiscrimination policies put the Plaintiffs in this case at a unique and substantial disadvantage when it comes to seeking recognized status from their respective schools, not all disadvantages are unconstitutional. Under existing Ninth Circuit case law, Plaintiffs' several constitutional claims must fail.

For all the foregoing reasons, **IT IS HEREBY ORDERED** Defendants' Motion for Summary Judgment is **GRANTED,** and Plaintiffs' Motion for Summary Judgment is **DENIED.** This disposition resolves all claims of all parties, and the Clerk is ordered to terminate this case.

**IT IS SO ORDERED.**